FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

2010 JUN 25 P 3: 43

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| Maribel Heisley<br>3707 Moss Brooke Court<br>Fairfax, VA 22031 | ) ) ) ) | |
| and | ) ) | |
| Stephen Andrew Heisley<br>3707 Moss Brooke Court<br>Fairfax, VA 22031 | ) ) ) ) | Civil No. _1:10 cv 714_<br>_LmB/IDD_ |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| Inova Health System<br>d/b/a Inova Fairfax Hospital<br>8110 Gatehouse Road<br>Falls Church, VA 22042 | ) ) ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' COMPLAINT FOR DECLARATIVE**
**AND INJUNCTIVE RELIEF AND DAMAGES**

NOW COME Plaintiffs Maribel Heisley and Stephen Andrew Heisley (collectively, "Plaintiffs" or "the Heisleys"), by and through their undersigned counsel, and file this action for declaratory judgment, injunctive relief, and damages against Defendant Inova Health System d/b/a Inova Fairfax Hospital for discriminating against individuals with disabilities, in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181, *et seq.* ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* ("Rehabilitation Act") and, in support therefore, allege as follows:

**I.    PRELIMINARY STATEMENT**

1.    This action arises from the repeated, ongoing, and systematic failure of

1

Defendant Inova Health System d/b/a Inova Fairfax Hospital ("Fairfax Hospital" or the "Hospital" or "Defendant") to provide effective communication between medical personnel and the Plaintiffs. Plaintiffs were denied equal access to benefits, services, and effective communication at the Hospital because of its repeated failure to provide them with qualified sign language interpreter services. Mr. and Mrs. Heisley were denied the opportunity to participate in decisions and discussions regarding medical treatment, denied the ability to understand serious medical procedures being performed on their infant son, and denied effective communication with physicians and health care providers at the Hospital, as required by Title III of the ADA and Section 504 of the Rehabilitation Act.

2.      Defendant is aware of its legal obligations under the ADA. In 2007 Defendant entered into a Settlement Agreement with the United States Department of Justice ("DOJ") that requires the Hospital to, among other things, provide appropriate auxiliary aids and services, including qualified sign language interpreters, when necessary for effective communication. (The Settlement Agreement is attached hereto as Exhibit A). This Settlement Agreement resulted from prior instances the Hospital failed to provide effective communication for the hearing impaired and was in effect at the time of Plaintiffs' son's birth and subsequent emergency room visits. As a result of Defendant's failure to provide qualified sign language interpreter services, it failed to provide effective communication in violation of Title III of the ADA, the Rehabilitation Act, and its 2007 Settlement Agreement with the DOJ, and Plaintiffs seek declaratory and injunctive relief, damages, and attorney fees.

## II.     JURISDICTION

3.     This Court has federal question jurisdiction over Plaintiffs' ADA and Rehabilitation Act claims under 28 U.S.C. § 1331.  Jurisdiction also lies in this court under 28 U.S.C. § 1343(a)(4), as a civil rights action.

4.     This Court has personal jurisdiction over Defendant because Defendant resides in this district.

5.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant resides in this district and because Defendant's acts and omissions giving rise to this action occurred in this district.

## III.    PARTIES

6.     Plaintiff Maribel Heisley is an adult resident of Fairfax, Virginia.  Ms. Heisley is deaf and is fluent in American Sign Language ("ASL").  She relies on ASL to communicate with others.  Ms. Heisley has sought, and will continue to seek, medical treatment for herself and for her children from Inova Fairfax Hospital, the Hospital closest to their house— approximately four and half miles, or eight minutes, from their home.

7.     Plaintiff Andrew Heisley is an adult resident of Fairfax, Virginia.  Mr. Heisley is deaf and is fluent in ASL.  He relies on ASL to communicate with others.  Mr. Heisley has sought, and will continue to seek, medical treatment for his family from Inova Fairfax Hospital, which is an eight minute drive from the home he shares with his wife, Plaintiff Maribel Heisley, and their children.

8.     Defendant Inova Health System owns and operates numerous health care facilities in northern Virginia, including Inova Fairfax Hospital, located at 3300 Gallows

Road, Falls Church, Virginia 22042. Inova Health System is a Virginia corporation located at 8110 Gatehouse Road, Falls Church, Virginia 22042. Defendant Inova Health System reported a net operating revenue of over $2 trillion in 2009. Defendant discriminates against deaf and hard of hearing individuals by failing to provide equal access to qualified ASL interpreters at both scheduled medical appointments and in emergency medical situations.

## IV.   FACTS

### A.   Labor and Immediate Complications

9.     On June 29, 2009, at approximately 4:00 p.m., Ms. Heisley went into labor at her home in Fairfax, Virginia.

10.     Dr. Emery, Ms. Heisley's OB/GYN, called to inform the Hospital that the Plaintiffs were en route and requested that a sign language interpreter be provided for them.

11.     The Heisleys arrived at the Hospital at approximately 5:00 p.m. An ASL interpreter arrived at approximately 6:00 p.m. to interpret for the Heisleys and medical personnel.

12.     At approximately 9:30 p.m., Dr. Berry performed an emergency caesarian section, and delivered the Heisley's son, S.J.H. ("J.H."). J.H.'s face and body were blue and the doctors rushed him to the Neonatal Intensive Care Unit ("NICU").

13.     Mr. Heisley, accompanied by the sole sign language interpreter, went with his infant son to the NICU.

14.     Shortly thereafter, Ms. Heisley began to experience complications. Medical personnel did not immediately notice Ms. Heisley's distress and she could not

communicate because no sign language interpreter was present. After some time, Ms. Heisley lost consciousness.

15.     Ms. Heisley awoke in the recovery room with the interpreter present. Ms. Heisley frantically finger spelled, "where's the baby, where's the baby" to the interpreter, who responded that Ms. Heisley could not see the baby, and that the doctors were running tests on him.

16.     At midnight, Ms. Heisley was transferred from the recovery room to a hospital room. The interpreter, who had arrived at 6:00 p.m., remained a few minutes past midnight to provide communication as Ms. Heisley was checked into her room. While the interpreter was still present, a nurse from J.H.'s operating room visited Ms. Heisley and informed her that there were problems with J.H.'s lungs and more tests would be required. Ms. Heisley asked to see her son, but the nurse refused her request.

17.     At approximately 12:15 a.m. on June 30, 2009, the supervising nurses dismissed the sign language interpreter from the Hospital.

18.     At that time, the supervising nurses knew that no other interpreter was on the way and no other interpreting services were available.

19.     The supervising nurses also knew that the interpreter who had been present was willing and wanted to stay at the Hospital past her shift to assist the Heisleys communicate.

20.     Upon the dismissal of the first interpreter, Ms. Heisley repeatedly asked the Hospital to provide another interpreter.

21.     Despite J.H.'s and Ms. Heisley's continuing medical needs and requests, no other interpreter was provided.

22.     At around 12:30 a.m. on June 30, 2009, Ms. Heisley paged her husband, who had left the Hospital to check on their other children, and told him there was a problem with J.H.'s lungs. Mr. Heisley arrived back at the Hospital shortly thereafter, and again requested an interpreter.

23.     When Mr. Heisley arrived, the doctors attempted to communicate to him that J.H. needed open heart surgery. No interpreter was present or available.

24.     Ms. Heisley then paged other family members, including her mother and grandmother, telling them that J.H. was seriously ill and that she could not understand what was going on because no interpreter was present.

25.     For at least seven hours the Heisleys repeatedly requested an interpreter to help them understand J.H.'s medical condition, but the Hospital failed to provide one.

26.     Between 6:30 and 7:00 a.m. on June 30, 2009, the Heisleys met with a cardiac surgeon and pediatric cardiologist. The Heisleys were unable to read the doctors' lips, did not understand what was being explained, and had to continually ask the doctors to repeat themselves.

27.     Without a sign language interpreter present, the doctors, through rudimentary drawings and written notes, attempted to tell the Heisleys that J.H. would die unless he had surgery. Although they could not effectively communicate with the doctors or understand J.H.'s condition, the Heisleys signed a surgery consent form.

28.     The doctors scheduled J.H. for open-heart surgery at 10:00 a.m. on June 30, 2009.

29.     Though the Heisleys were unaware at the time, they later found out that their aunt and uncle had arrived at Inova Fairfax Hospital around 7:00 a.m. on June 30,

2009.

30.     Joann Laboy, Ms. Heisley's aunt, can hear and knows conversational ASL. Ms. Laboy informed hospital staff that she could sign and could act as a temporary interpreter for the Heisleys. Hospital staff told Ms. Laboy that she could not see the Heisleys or J.H. Ms. Laboy and her husband waited in the lobby for three hours before leaving. Hospital staff never told the Heisleys that their aunt and uncle were present or that Ms. Laboy had offered to provide interpreting services.

31.     At 7:30 a.m. on June 30, 2009, there was a nurse shift change. The new nurse asked the Heisleys if any staff had called for an interpreter. The Heisleys explained they needed an interpreter, and had requested one, but that one had not been provided.

32.     At some point J.H.'s surgery was postponed until noon. Mr. and Ms. Heisley were never told why the time of surgery was changed.

33.     At approximately 12:00 p.m. J.H. was taken in for surgery. At approximately 2:00 p.m., roughly two hours into J.H.'s five-hour surgery, a sign language interpreter arrived. The sign language interpreter was present at the Hospital until 8:00 p.m. on June 30, 2009.

34.     After 8:00 p.m. on June 30, 2009, no sign language interpreter was provided, even though Ms. Heisley requested an interpreter given the critical condition of her son.

35.     The next morning, July 1, 2009, Ms. Laboy returned to the Hospital and was able to see the Heisleys.

36.     At around 7:30 a.m., J.H.'s doctors performed their rounds. With no qualified sign language interpreter present, the doctors told Ms. Heisley that, in addition

to J.H.'s lung and heart complications, J.H. had a paralyzed diaphragm and remained in critical condition. Ms. Laboy was able to sign and interpret for Ms. Heisley.

37.     Although a sign language interpreter was provided for approximately four hours during the afternoon on July 1, 2009, doctors frequently attempted to communicate with Ms. Heisley at other times during the day without an interpreter.

38.     Without a qualified interpreter, Ms. Heisley was unable to understand complicated medical terminology. She attempted to lip-read, but this is an inaccurate and inadequate means of communication. Ms. Heisley asked the doctors to write down the most significant medical terms they were using so that she could research those terms on her own.

39.     Communication with the doctors was so difficult without a sign language interpreter that the only conversations Ms. Heisley had on her own with the doctors for the next several days was limited to them answering "yes or no" in response to her questions whether J.H. was alive.

**B.     Prolonged Hospitalization After Labor and Immediate Complications**

40.     After his birth and the ensuing heart surgery and medical complications, J.H. remained at Inova Fairfax Hospital for five weeks.

41.     During this time, Ms. Heisley rarely left the Hospital. When she did leave, it would generally be for less than two hours and only when a hearing family member was available to stay with J.H.

42.     On or about July 5, 2009, during the second week of J.H.'s hospitalization, Inova Fairfax hired Brenda Barnes, an ASL deaf cultural consultant. Ms. Barnes met with Ms. Heisley and asked Ms. Heisley when she needed an interpreter.

43.    Starting on or about July 8, the Hospital provided sign language interpreters to the Heisleys between the hours of 7:30 a.m. and 8:00 p.m.

44.    The sign language interpreters worked in two shifts—7:30 a.m. to 2:00 p.m. and 2:00 p.m. to 8:00 p.m.

45.    The Heisleys were provided with a different interpreter for each shift, none of whom was familiar with J.H.'s complicated and personal medical situation. The Heisleys were forced to explain the situation repeatedly to new interpreters, an exercise a hearing individual would never suffer through.

46.    Upon Ms. Heisley's request, the Hospital arranged for the same five interpreters be provided on rotation instead of providing a new interpreter for every shift.

47.    Due to J.H.'s frequent, complicated, and unpredictable medical emergencies, Ms. Heisley asked Ms. Barnes for an interpreter during the day and overnight.

48.    Despite the fact that numerous critical incidents involving J.H.'s health arose overnight, the Hospital never provided a sign language interpreter between 8:00 p.m. and 7:30 a.m.

49.    The doctors at the Hospital were constantly on standby regarding J.H.'s health. J.H.'s chest was left open for the first week and a half of his hospitalization. Additionally, J.H. suffered from an irregular heartbeat. His heart monitor would frequently go off overnight, requiring the immediate attention of medical staff.

50.    Ms. Heisley was unable to effectively communicate with medical personnel during these numerous incidents.

51.    Mr. Heisley's communication is more restricted than his wife's, as his

voice is not intelligible. Without an interpreter, therefore, he was unable to understand details of his son's medical condition and was unable to provide meaningful consent to required medical procedures. Mr. Heisley was unable to substitute for his wife at any time during the Hospital stay.

52.     In addition to these overnight emergencies, J.H.'s doctors generally made rounds in the early morning, often by-passing Ms. Heisley's room because an interpreter was not present.

53.     Ms. Heisley described the five weeks that J.H. was in the Hospital as "pure hell," as she and her husband were unable to communicate effectively with the medical staff at critical times, and they were never sure they would be able to communicate effectively during their newborn son's inevitable next medical crisis.

54.     Before J.H.'s release from the Hospital, the Inova Fairfax Hospital Patient Relations Coordinator, Jennfier Fiorenzo, apologized to the Heisleys for the lack of sign language interpreter services and promised the Hospital would conduct an investigation into the matter. At this time, the Heisleys have not been informed what, if anything, this investigation concluded.

C.     **Home Care and Subsequent Emergency Room Visits**

55.     On August 5, 2009, J.H. was released from the Hospital with a feeding tube.

56.     The Hospital coordinated a home care nurse through Infoscience to come to the Heisleys' home two to three times a week to explain to the Heisleys how to operate the feeding tube machine and to check on J.H.'s health.

57.     The Heisleys requested that they have a home nurse who could

communicate through sign language, and the Hospital reassured them that the nurse would know ASL.

58.     On the day of J.H.'s release from the Hospital, a nurse arrived at the Heisleys' home. She did not know sign language, which made communication with her virtually impossible.

59.     Further complicating matters, the home care company programmed the feeding tube machine improperly. This caused food to enter into J.H.'s body rapidly, force-feeding him instead of slowly feeding him over an extended period of time.

60.     The Heisleys were unaware of the programming error until August 7, 2009, when J.H. began vomiting uncontrollably.

61.     The Heisleys rushed J.H. to the Inova Fairfax Hospital emergency room on August 7, 2009, between 10:00 and 11:00 p.m.

62.     Despite their repeated requests, no interpreter was provided to the Heisleys until after 7:30 a.m. on August 8, 2009, more than eight hours after J.H. was admitted to the emergency room.

63.     J.H. remained in the Hospital until later on August 8, 2009.

64.     On August 11, 2009, while at home, J.H. pulled out his feeding tube. Ms. Heisley attempted to reinsert the feeding tube, but was unable to do so. Between 9:00 and 10:00 p.m., the Heisleys brought J.H. back to the Inova Fairfax Hospital emergency room.

65.     The Heisleys again requested a sign language interpreter. The Hospital failed to provide an interpreter.

66.     As a result of the Hospital's failure to provide effective communication,

Ms. Heisley contacted Access Interpreting service on her own.  An interpreter arrived shortly thereafter.

67.    J.H. remained hospitalized until August 13, 2009, and interpreters were present during the day only.

68.    In November 2009, Ms. Heisley returned to the Inova Fairfax Hospital Emergency Room with her daughter.  Upon arrival, Ms. Heisley noticed a woman attempting to communicate with a nurse through written notes.

69.    The woman, who is deaf and has no speaking ability, looked on helplessly while her son, who is also deaf, received medical care.  The woman told Ms. Heisley, through ASL, that she waited in the emergency room for over two hours after requesting an interpreter, but that no interpreter had been provided.

70.    Ms. Heisley again notified the staff of this woman's and child's need for a sign language interpreter.

71.    The staff pulled out a manual and called the number listed for an interpreter agency.  As had repeatedly happened, no one answered the phone at that number.  The number listed in the Hospital's manual was for an out-of-business interpreter agency.

72.    The staff person made no other attempts to secure a sign language interpreter until Ms. Heisley provided the Hospital staff with the phone number for Access interpreting agency, which she had stored on her phone during her previous visits to the Hospital.  The staff person called that agency and an interpreter arrived 20 to 25 minutes later.

73.    Ms. Heisley also told the staff person to call Brenda Barnes.  Although

Ms. Barnes is the ASL coordinator for the hospital, she was not aware that there were individuals requiring sign language interpreter services who had been forced to wait in the emergency room for over two hours.

74.     On this same day, Ms. Heisley expressed her concerns to Ms. Barnes regarding the Hospital's ongoing failure to timely provide sign language interpreter services.

75.     Mr. and Ms. Heisley live approximately four and a half miles from Inova Fairfax Hospital and use the Inova Fairfax emergency room for all family medical emergencies. While J.H.'s medical condition is currently stable, he still suffers from ongoing medical conditions such as a paralyzed left diaphragm, an irregular heartbeat, a paralyzed left vocal cord, and an immune disorder that requires weekly blood infusions. The Heisleys worry that J.H., or any of their three other children, will require medical care at Inova Fairfax Hospital and that the Heisleys will not be provided with sign language interpreters. They fear that a lack of effective communication with medical personnel may create a misunderstanding that could jeopardize their children's lives.

## V.     DEFENDANT INOVA FAIRFAX'S OBLIGATION PURSUANT TO THE SETTLEMENT AGREEMENT WITH THE U.S. DEPARTMENT OF JUSTICE

76.     On March 6, 2003, the U.S. Department of Justice ("DOJ") received a complaint against Inova Fairfax, alleging violations of Title III of the ADA and its implementing regulation, 28 C.F.R. Part 36. Specifically, the complaint alleged, among other issues, that Inova Fairfax failed to timely provide sign language interpreters upon request where necessary to allow for effective communication.

77.     After an investigation, the DOJ found that Inova Fairfax violated Title III

of the ADA and its implementing regulation by discriminating against individuals who are deaf and those related to or associated with them.

      78.    On April 9, 2007, Inova Fairfax entered into a Settlement Agreement ("Agreement") with the United States.[1]

---

[1] The DOJ Agreement provides, in part:

a.    "[T]he hospital will provide to Patients and Companions any appropriate auxiliary aids and services that may be necessary for effective communication . . . ." (¶ III.B.1).

b.    "The Program will include, among other things . . . [t]he designation of one or more Administrative Directors who will be available twenty-four (24) hours a day, seven (7) days a week, to answer questions and provide assistance and authorization for immediate access to and proper use of the appropriate auxiliary aids and services, and qualified sign language and oral interpreters . . . ." (¶ III.A.2.b).

c.    "For 'scheduled incidents,' the Hospital will take appropriate steps to make an interpreter available at the time of the scheduled appointment, if necessary for effective communication. 'Scheduled incidents' are situations in which there are two or more hours (or four or more hours if a request is made between the hours of 8 p.m. and 8 a.m. or a weekend or holiday) between the time when a Patient or a Companion makes a request for an interpreter and when the services of the interpreter are required." (¶ III.C.4(b)).

d.    "For 'non-scheduled incidents,' the Hospital shall contact its interpreter service provider as soon as practicable, which in most instances will be within 15 minutes of the Patient's or Companion's request to the Hospital. However, the time within which the interpreter is provided shall be no more than (a) two hours from the time the call is placed to the interpreter service if the service is provided through a contract interpreting service or a staff interpreter who is located off-site at the time the need arises or (b) 30 minutes from the time the Patient's or Companion's request is made if the service is provided through an interactive audio/video conference system or an on-site staff interpreter. 'Non-scheduled incidents' are situations in which there are less than two hours (or less than four hours if a request is made

79.    The Settlement Agreement became effective on April 9, 2007 and, by its

terms, remained in effect for thirty months from that date.  (¶ III.F).  As such, the

Agreement was in effect until October 2009.

80.    Inova Fairfax failed to comply with the Agreement, which was in effect at

the time of its treatment of Plaintiffs Maribel and Andrew Heisley, referenced above.

Most significantly, Inova Fairfax failed to provide the Heisleys, in their capacity of both

patient and companion to their infant son, appropriate auxiliary aids and services

necessary for effective communication, repeatedly failed to provide a sign language

interpreter for 'non-scheduled incidents' within the requisite time period, and failed to

train staff how to secure appropriate auxiliary aids and services as quickly as possible.

---

between the hours of 8 p.m. and 8 a.m. or on a weekend or holiday) between the time when a Patient or a Companion makes a request for an interpreter and the time when the services of an interpreter are required." (¶ III.C.4(a)).

e.    "The Hospital will continue to maintain one or more contracts with an interpreter service provider or providers ("IS Provider") to provide qualified sign language and oral interpreters at the request of the Hospital, and in accordance with the requirements of this Agreement.  In lieu of utilizing a contracted IS Provider, the Hospital may hire one or more qualified sign language interpreters to be available 24 hours per day." (¶ III.C.3).

f.    "The Hospital will provide mandatory in-service training . . . . includ[ing] the following objectives: to promptly identify communication needs and preferences of Patients and Companions; to secure as quickly as possible appropriate auxiliary aids and services (including, where necessary, qualified interpreter services); and to identify and recognize treatment- or Department-specific needs or issues that may arise . . . ." (¶ III.F).

## VI.   COUNTS

### A.   COUNT I

**Discrimination on the Basis of a Disability in Violation of
Title III of the Americans with Disabilities Act of 1990
(42 U.S.C. § 12181 *et seq.*)**

81.     Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

82.     On July 12, 1990 Congress enacted the Americans with Disabilities Act ("ADA") "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

83.     At all times relevant to this action, the ADA was in full force and effect in the United States and Plaintiffs had a right not to be subjected to discrimination on the basis of their disability by Defendant. 42 U.S.C. § 12182.

84.     Title III of the ADA requires that, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

85.     The ADA defines a disability as "a physical . . . impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A).  Major life activities include hearing and speaking.  42 U.S.C. § 12102(2)(A).

86.     Plaintiffs Andrew and Maribel Heisley are deaf and qualify as individuals with disabilities under the meaning of 42 U.S.C. §§ 12102(1)(A), 12102(2)(A).

87.     Inova Fairfax Hospital is a place of "public accommodation" within the meaning of the ADA.  42 U.S.C. § 12181(7)(F).

88.     Defendant Inova Health System "owns, leases (or leases to), or operates" Inova Fairfax Hospital, a place of public accommodation.  42 U.S.C. § 12182(a).

89.     Under Title III of the ADA, discrimination is described, in part, as "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, . . . or otherwise treated differently than other individuals because of the absence of auxiliary aids and services . . . ."  42 U.S.C. § 12182 (2)(iii).

90.     Auxiliary services include but are not limited to, "qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments."  42 U.S.C. § 12103(1)(A); *see also* 28 C.F.R. § 36.303(b)(1).

91.     Defendant subjected the Heisleys to discrimination based upon their disability in violation of their rights under Title III of the ADA.  Defendant repeatedly failed to provide the Heisleys with auxiliary services in the form of qualified interpreters on numerous occasions at Defendant's Inova Fairfax Hospital.  Defendant failed to ensure that Mr. and Ms. Heisley were not excluded, denied services, or otherwise treated differently than other individuals as required by 42 U.S.C. § 12182(2)(iii).

92.     Regulations implementing Title III of the ADA clearly require the provision of effective communication as part of its nondiscrimination mandate.

93.     Effective communication is achieved when a public accommodation furnishes "appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."  28 C.F.R. § 36.303(c).

94.     Defendant discriminated against Ms. Heisley, in the role of both patient and patient's companion, and Mr. Heisley, in the role of companion to his newborn, J.H., when Defendant failed to provide them with qualified sign language interpreters during meetings with medical professionals, including during critical meetings when decisions had to be made concerning the care of J.H.

95.     Defendant treated Mr. and Ms. Heisley differently than hearing individuals by not providing the necessary auxiliary services that would have enabled them to effectively communicate with medical professionals and Hospital staff.

96.     At all times relevant to this action, Defendant was aware of its obligations to provide appropriate auxiliary aids to the Heisleys, and other deaf individuals, as required by ADA. Defendant was under the binding Settlement Agreement with the United States, signed April 9, 2007 and effective for the following thirty months, which required Defendant to provide "any appropriate auxiliary aids and services that may be necessary for effective communication . . ." at its facilities, including Inova Fairfax Hospital. (¶ III.B.1). Defendant violated that Agreement when it failed to provide Plaintiffs with appropriate auxiliary services.

97.     As a proximate cause of Defendant's violations of the Heisleys' rights under the ADA, Plaintiffs have suffered, and continue to suffer, discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights and privileges.

98.     Defendant's failure to comply with the ADA has resulted, and may continue to result, in harm to Mr. and Ms. Heisley, as they will continue to avail

themselves of the services, benefits, activities, programs, and privileges of Defendant's Inova Fairfax Hospital. This harm will continue unless and until Defendant is ordered by this Court to make modifications to its policies, practices, and procedures pursuant to the ADA.

### B.    COUNT II

**Discrimination on the Basis of Disability in Violation of the Rehabilitation Act**
**(29 U.S.C. § 794 *et seq.*)**

99.    Plaintiffs reallege and incorporate by reference each and every allegation above as if fully set forth herein.

100.    The purpose of the Rehabilitation Act is to ensure that no "qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

101.    At all times relevant to this action, the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, was in full force and effect and applied to Defendant's conduct.

102.    Plaintiffs Andrew and Maribel Heisley are qualified individuals with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9)(B).

103.    The operations of Inova Health System and the Inova Fairfax Hospital are "program[s] or activit[ies]" within the meaning of 29 U.S.C. § 794(b)(3)(A)(ii).

104.    Defendant receives Federal financial assistance within the meaning of the Rehabilitation Act. 29 U.S.C. § 794(a).

105.    The Department of Health and Human Services regulations implementing the Rehabilitation Act clarify the requirements for Federal financial recipients, such as Defendant, stating that "[a] recipient ... that employs fifteen or more persons shall provide appropriate auxiliary aids to persons with impaired sensory . . . or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question." 45 C.F.R § 84.52(d)(1).

106.    Appropriate auxiliary aids include, but are not limited to, interpreters. 45 C.F.R. § 84.52(d)(3).

107.    Defendant, despite consistent and repeated requests by Mr. and Ms. Heisley, refused to provide sign language interpreters during J.H.'s prolonged initial hospitalization, and subsequent hospitalizations, at Defendant's Inova Fairfax Hospital. As such, the Heisleys' ability to communicate with medical personnel was significantly impaired, and they were excluded from the discussions and decisions relating to their son's critical medical treatment.

108.    As a proximate cause of Defendant's violations of the Heisley's rights under the Rehabilitation Act, the Heisleys have suffered discrimination, unequal treatment, exclusion, violations of their rights under the laws of the United States, loss of dignity, frustration, humiliation, emotional pain and suffering, anxiety, embarrassment, and unnecessary loss of rights and privileges.

109.    Defendant's failure to comply with the Rehabilitation Act has resulted, and continues to result, in harm to Mr. and Ms. Heisley, as they will continue to avail themselves of the services, benefits, activities, programs, and privileges of Defendant's Inova Fairfax Hospital. This harm will continue unless and until Defendant is ordered by

this Court to make modifications to its policies practices, and procedures pursuant to the Rehabilitation Act.

## VII. PRAYER FOR RELIEF

110. WHEREFORE, Plaintiffs respectfully request that this Court:

    a. Enter such declaratory and injunctive relief under Title III of the ADA and 504 against Defendant and in favor of Plaintiffs as it deems appropriate to remedy past violations of the laws of the United States and to prevent future violations of the same;

    b. Enter judgment against Defendant and in favor of Plaintiffs for such nominal and compensatory damages as suffered by Plaintiffs under Section 504 of the Rehabilitation Act;

    c. Enter judgment against Defendant and in favor of Plaintiffs for the costs of litigation, including reasonable attorneys' fees;

    d. Award Plaintiffs any further relief the Court deems appropriate.

## VIII. JURY TRIAL DEMAND

111. Plaintiffs, by their counsel and pursuant to Federal Rule of Civil Procedure 38(b), hereby demand a trial by jury on all claims so triable in this action.

Dated this 25 day of June, 2010.

Respectfully submitted,

*Caroline A. Crenshaw*

Caroline A. Crenshaw (Va. Bar No. 78407)
Lewis S. Wiener
SUTHERLAND ASBILL & BRENNAN LLP
1275 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 383-0100
Facsimile: (202) 637-3593
caroline.crenshaw@sutherland.com
Lewis.wiener@sutherland.com


E. Elaine Gardner
Laura A. Mancini
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS & URBAN AFFAIRS
11 Dupont Circle, N.W.; Suite 400
Washington, D.C. 20036
Telephone: (202) 319-1000
Facsimile: (202) 319-1010
elaine_gardner@washlaw.org
laura_mancini@washlaw.org


Marc P. Charmatz
Debra Patkin
NATIONAL ASSOCIATION OF THE DEAF
8630 Fenton Street, Suite 820
Silver Spring, MD 20910
Telephone (301) 587-7732
Facsimile (301) 587-1791
marc.charmatz@nad.org

*Counsel for Plaintiffs*